**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AMY YAKSIMA,<br>325 Beade Street<br>Plymouth, PA 18651<br>        *Plaintiff*<br>v. | JURY TRIAL DEMANDED<br><br>CIVIL ACTION<br><br>CASE NO. 3:23-cv-8-KM |
| ANDREW JOHN TUZINSKI<br>*In his individual and official capacity*<br>501 River Street<br>Forty Fort, PA 18704 | **AMENDED COMPLAINT**<br><br><br>ELECTRONICALLY FILED |
| NICKOLAS BASOV<br>*In his individual and official capacity*<br>26 N. Baltimore Ave.<br>Mt. Holly Springs, PA 17065 | |
| ANTHONY SMITH<br>*In his individual and official capacity*<br>1271 Wyoming Ave.<br>Forty Fort, PA 18704 | |
| JOHN OWENS<br>*In his individual capacity*<br>1212 Main Street<br>Swoyersville, PA 18704 | |
| JEFF RAMIREZ<br>*In his individual capacity*<br>144 Academy Street<br>Luzerne, PA 18709 | |
| JOSHUA WOLINSKY<br>*In his individual capacity*<br>1212 Main Street<br>Swoyersville, PA 18704 | |
| FORTY FORT BOROUGH<br>1271 Wyoming Ave<br>Forty Fort, PA 18704,<br>        *Defendants*. | |

## AMENDED COMPLAINT[1]

## I. INTRODUCTION

1.      This is an action for damages brought under 42 U.S.C. §§ 1983, 1988, the Fourth Amendment, the Fourteenth Amendment and for violations of Pennsylvania State law.

## II. JURISDICTION AND VENUE

2.      The foregoing paragraphs are incorporated herein by reference.

3.      This action is brought pursuant to 42 U.S.C. §§ 1983, 1988, the Fourth Amendment, and the Fourteenth Amendment to the United States Constitution. Jurisdiction is based upon 28 U.S.C. § 1331 and the previously mentioned statutory and Constitutional provisions.

4.      Plaintiff invokes this Court's supplemental jurisdiction under 28 U.S.C. § 1367 to hear and decide claims under state law as the state law claims are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper under 28 U.S.C. § 1391 in this Court because the conduct complained of occurred here and at least one defendant resides here.

---

[1] Plaintiff files this Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). Defendant Ramirez filed and served his Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) on April 21, 2023. Therefore, this complaint is filed within the 21-day timeline of Rule 15(a)(1)(B).

## III. **PARTIES**

6.      The foregoing paragraphs are incorporated herein by reference.

7.      Amy Yaksima ("Plaintiff") is an adult individual and resides at 325 Beade Street, Plymouth, PA 18651.

8.      Nikolas Basov ("Basov") was at all relevant times to this complaint a police officer employed by the Forty Fort Borough police department and acting under color of state law. Basov was leading the investigation, the commanding officer and/or supervisor for the other police officer Defendants and/or individuals that conducted the unconstitutional activity as alleged *infra* and was responsible for their training, supervision and conduct. He also was responsible by law for enforcing the regulations and/or policies of the Forty Fort Borough police department and ensuring that all individuals under his supervision and/or authority obeyed the laws of the United States and Commonwealth of Pennsylvania. At all relevant times, Basov was acting in such capacity as the agent, servant, and employee of Forty Fort Borough. This suit is against Basov in his individual and official capacity.

9.      Anthony Smith ("Smith") was at all relevant times to this complaint a police officer employed by the Forty Fort Borough police department and acting under color of state law. Smith was the senior officer and/or supervisor for the other police officer Defendants and/or individuals that conducted the

unconstitutional activity as alleged *infra* and was responsible for their training, supervision and conduct. He also was responsible by law for enforcing the regulations and/or policies of the Forty Fort Borough police department and ensuring that all individuals under his supervision and/or authority obeyed the laws of the United States and Commonwealth of Pennsylvania. At all relevant times, Smith was acting in such capacity as the agent, servant, and employee of Forty Fort Borough. This suit is against Smith in his individual and official capacity.

10.     Andrew John Tuzinski ("Tuzinski") was the mayor of Forty Fort Borough at all times relevant to this complaint and acting under color of state law. As described in detail *infra*, Tuzinski was intimately involved in the unconstitutional and illegal conduct and provided direction and encouragement for the other Defendants to engage in unconstitutional and illegal conduct. Tuzinski was the top policy maker, in control of the Forty Fort Borough police department, and chief law enforcement officer for Forty Fort Borough and his words and/or directions were that of Forty Fort Borough. As the chief policy maker for Forty Fort Borough, head of the Forty Fort Borough police department, and since he was personally involved in all aspects of the illegal conduct, Tuzinski was the supervisor for all Defendants during the unconstitutional activity as alleged *infra* and was responsible for their

training, supervision and conduct. Tuzinski's conduct, statements, and directions were the policy of Forty Fort Borough. He also was responsible by law for enforcing the regulations and/or policies of Forty Fort Borough and ensuring that all individuals under his supervision and/or authority obeyed the laws of the United States and Commonwealth of Pennsylvania. At all relevant times, Tuzinski was acting in such capacity as the agent, head of the Forty Fort Borough police department, chief policy maker, servant, and employee of Forty Fort Borough. This suit is against Tuzinski in his individual and official capacity.

11.     Officer John Owens ("Owens") is, and was at all times relevant to this complaint, a police officer employed by Swoyersville Borough ("Swoyersville") and acting under color of state law. At all relevant times, Owens was acting in such capacity as the agent, servant, and employee of Swoyersville. This suit is against Owens in his individual capacity.

12.     Jeff Ramirez ("Ramirez") is, and was at all times relevant to this complaint, a police officer employed by Luzerne Borough ("Luzerne") and acting under color of state law. At all relevant times, Ramirez was acting in such capacity as the agent, servant, and employee of Luzerne. This suit is against Ramirez in his individual capacity.

13.     Officer Joshua Wolinsky ("Wolinsky") is, and was at all times relevant to this complaint, a police officer employed by Swoyersville and acting under color of state law. At all relevant times, Wolinsky was acting in such capacity as the agent, servant, and employee of Swoyersville. This suit is against Wolinsky in his individual capacity.

14.     Forty Fort Borough ("Forty Fort") is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Forty Fort police department.

15.     At all relevant times hereto, and in their actions and inactions, Defendants were acting alone and in concert under color of state law.

16.     At all relevant times hereto, all Defendants were acting directly or indirectly on behalf of Forty Fort.

17.     At all relevant times hereto, Owens and Wolinsky were acting directly or indirectly on behalf of Swoyersville.

18.     At all relevant times hereto, Basov, Smith, and Tuzinski were acting in the course and scope of their agency, authority, and/or employment with Forty Fort and under color of state law.

19.     At all relevant times hereto, Owens and Wolinsky were acting in the course and scope of their agency, authority, and/or employment with Swoyersville and under color of state law.

20.     Forty Fort employed Basov, Smith, and Tuzinski at all times relevant hereto.

21.     Swoyersville employed Owens and Wolinsky at all times relevant hereto.

22.     All Defendants worked in concert and coordination with each other at all times relevant hereto.

23.     Basov was the lead investigator on Albarella's case as alleged *infra* and in charge of the investigation during the time periods relevant to this Amended Complaint. Therefore, Basov was supervising and/or in charge of the conduct of his subordinates, including, but not limited to, Smith, Owens, Ramirez, and Wolinsky.

24.     Smith was the senior police officer on duty during the time periods relevant to the Amended Complaint. As such, Basov allowed Smith to direct certain conduct and inform certain decisions Basov made during the time periods relevant to this Amended Complaint. Therefore, Smith was supervising and/or in charge of the conduct of his subordinates, including, but not limited to, Basov, Owens, Ramirez, and Wolinsky.

25.     Tuzinski was the mayor of Forty Fort and therefore, the head of the Forty Fort Borough police department and the policymaker for Forty Fort at all times relevant to this Amended Complaint. As the head of the Forty

Fort Borough police department, Tuzinski was the supervisor and/or in charge of all other Defendants.

26.     Tuzinski's directions and encouragement to all Defendants to engage in illegal and unconstitutional conduct therefore became the policy of Forty Fort.

27.     Defendants acted in concert when deciding to engage in the conduct described herein and in conducting the unconstitutional activity as described in detail *infra*.

28.     Defendants are jointly and severally liable for the injuries and damages suffered by Plaintiff as set forth fully below.

## IV. <u>STATEMENT OF CLAIM</u>

29.     The foregoing paragraphs are incorporated herein by reference.

30.     On or about February 6, 2021, Tuzinski called David Coslet ("Coslet"), a Pennsylvania State Parole Officer, to inform him that Gregory Albarella ("Albarella")[2] was wanted by the Forty Fort police for felony fleeing and eluding.[3]

---

[2] Albarella was on parole for a driving under the influence charge from New York State. His parole was transferred from New York to Pennsylvania.

[3] Albarella was employed at CC Motor Sports which is an ATV repair shop. CC Motor Sports has two locations in Forty Fort at 1340 Wyoming Avenue and at 19 Shoemaker Street. Police accused Albarella of fleeing on an ATV from police. The Commonwealth later dropped the felony fleeing charges and allowed Albarella to plead guilty to summary traffic violations. This was a clear indication that the charges filed against Albarella were unwarranted from their inception.

31.     Tuzinski specifically requested Coslet's help in finding Albarella.

32.     Coslet met Tuzinski and Basov at the Forty Fort police department on February 6, 2021.

33.     Coslet, Basov, and Tuzinski then went to 105 Oak Street, Forty Fort, PA 18704 ("105 Oak St."), which was Albarella's state parole approved residence, and where Albarella's wife lived, to search for Albarella.

34.     Albarella's wife informed Coslet, Basov, and Tuzinski that Albarella was not at 105 Oak Street, they were estranged, and she had not seen him in the last week.

35.     Coslet, Basov, and Tuzinski then went to Yaksima's Home at 22 Sullivan Street, Forty Fort, Pennsylvania ("22 Sullivan St." or "Yaksima's Home") to look for Albarella.

36.     Yaksima told Coslet, Basov, and Tuzinski that Albarella occasionally stayed at 22 Sullivan St. and that Albarella was not at Yaksima's Home at this time.

37.     Yaksima declined to consent to a police search of 22 Sullivan St. in a valid exercise of her constitutional rights.

38.     Coslet, Basov, and Tuzinski never saw Albarella at 22 Sullivan St. on February 6, 2021.

39.     Coslet, Basov, and Tuzinski had no evidence that Albarella was present at 22 Sullivan St. on February 6, 2021.

40.     Coslet testified under oath that after his investigation on February 6, 2021, he "had no probable cause to enter" 22 Sullivan St. to look for Albarella.

41.     Coslet also testified under oath that he had no reason to enter 22 Sullivan St. because he never saw Albarella at that address.

42.     On February 7, 2021, Basov, Smith, Tuzinski, Owens, Ramirez, and Wolinsky returned to 22 Sullivan St. looking for Albarella.

43.     At 6:26p.m. on February 7, 2021, dispatch reports show that police went to 22 Sullivan St. to "SERVE WARRANT".

44.     Smith and Basov were wearing body cameras on February 7, 2021.

45.     Smith's body camera begins at roughly 6:35p.m. on February 7, 2021. A redacted copy of Smith's body camera is attached as Exhibit A.[4] [5]

46.     Smith can be scene skulking around Yaksima's Home in the beginning of the footage.[6]

---

[4] The video attached as Exhibit A was redacted to remove the images of minor children. A full and complete copy of the body camera can be provided in discovery.

[5] Since the video cannot be uploaded electronically, undersigned will send a physical copy to the clerk of the Middle District of Pennsylvania.

[6] Exhibit A, 3:26.

47.      At this time, Ramirez is positioned towards the rear of Yaksima's Home.

48.      At this time, Wolinsky and Basov are positioned towards the front of Yaksima's Home.

49.      Smith received a phone call while he was waiting outside the rear of Yaksima's Home from Basov wherein Basov stated that Albarella was not answering his phone.[7]

50.      Smith informed Basov that if Albarella didn't answer his phone, they would go to the front of Yaksima's Home and "start banging" on the door.[8]

51.      No claims and/or concerns of suicide or homicide are mentioned and/or expressed during this phone call or to this point on the body camera footage.

52.      The content of Smith and Basov's conversation and Smith and Basov's demeanor showed they were not concerned that Albarella was suicidal or homicidal at this time.

53.      Basov then banged on Yaksima's front door for an extended period of time.

_____

[7] Exhibit A, 5:30–5:50.
[8] *Id.*

54.     Basov, Smith, Wolinsky, and Ramirez observed no movement inside the home, heard no noises coming from the home, and no one answered the door.

55.     During this time frame, Ramirez and Wolinsky were outside of Yaksima's Home and could hear and observe Smith and Basov's conduct.

56.     Basov suggested calling Yaksima's landlord to enter the house under the false pretense of an emergency.[9]

57.     Smith stated that the "DA" informed police that they did not have enough evidence to establish probable cause for a search warrant and if they don't have enough evidence for a search warrant, they cannot use the exigency doctrine to enter the residence.[10]

58.     This was a clear acknowledgement that Smith, Basov, Ramirez, and Wolinsky knew they needed probable cause to believe Albarella was in 22 Sullivan St. and exigency in order to enter the home under the exigency exception to the warrant requirement.

59.     In response, Wolinsky stated that he thought he heard someone cry out "help" from 22 Sullivan St. and asked Basov, Smith, and Ramirez "did you hear help?"

---

[9] Exhibit A, 10:55–11:20.
[10] Exhibit A, 11:22–11:30.

60.      Wolinsky, Smith, Ramirez, and Basov then shared a laugh about Wolinsky's attempt to falsify exigency.[11]

61.      Smith, Wolinsky, Ramirez, and Basov could not see movement inside 22 Sullivan St.

62.      Ramirez and Wolinsky discussed that the District Attorney's Office would not approve a search warrant based upon the facts they had at this time.

63.      This demonstrated that both Ramirez and Wolinsky knew the District Attorney would not approve a search warrant or entry into the home based upon the evidence they possessed.

64.      Smith called Tuzinski using his cell phone.[12]

65.      Smith asked Tuzinski what the rules were regarding a landlord going into a home and if Tuzinski knew the landlord.

66.      Smith informed Tuzinski that Albarella was not answering his phone.

67.      Tuzinski responded with surprise that Albarella was not answering his phone and Tuzinski did not know police had not made contact with Albarella yet.

---

[11] Exhibit A, 11:35–11:46.
[12] Exhibit A, 12:54.

68.     No concerns regarding suicidal and/or homicidal statements or conduct were expressed during this phone call.

69.     Tuzinski and Smith were both unconcerned with suicidal and/or homicidal statements or conduct during this phone call.

70.     Tuzinski offered to call Albarella himself.

71.     Smith responded, "you could try him."

72.     Tuzinski also relayed that he was coming to 22 Sullivan St.

73.     Smith approached a vehicle driven by Tuzinski.[13]

74.     Tuzinski attempted to call Albarella on the phone, the phone rang, but no one answered.

75.     Smith commented that when Basov called Albarella, the call went straight to voicemail.

76.     However, when Tuzinski called Albarella, the phone rang prior to going to voicemail.

77.     Tuzinski then stated he would keep calling Albarella.

78.     Smith agreed with this premise so that police could determine if they could hear Albarella's phone audibly ring inside 22 Sullivan St.

79.     Tuzinski then repeatedly called Albarella's phone number.

---

[13] Exhibit A, 14:36.

80.     Smith, Basov, Ramirez, Wolinsky, and Tuzinski could not hear Albarella's phone ring from inside the residence.

81.     Tuzinski then suggested he should call code enforcement for Forty Fort to see if they had a phone number for Yaksima.

82.     Smith agreed with this suggestion.

83.     Smith then informed Basov, Wolinsky, and Ramirez that Tuzinski was going to get Yaksima's phone number and attempt to call her.

84.     Tuzinski told Smith that he heard someone calling for help inside of 22 Sullivan St.[14]

85.     Smith laughed at Tuzinski's attempt to falsify exigency.[15]

86.     Tuzinski said that he previously illegally entered a residence in Forty Fort by fabricating someone calling for help.[16]

87.     Tuzinski's comment was an implied direction for Smith, Basov, Ramirez, and Wolinsky to falsify exigency to enter Yaksima's Home.

88.     Smith replied, "that is the old school way to do it."[17]

89.     Smith's comment "that is the old school way to do it" was an acknowledgement that he had employed the same tactic previously.

---

[14] Exhibit A, 20:06–20:33.
[15] Exhibit A, 20:06–20:33.
[16] Exhibit A, 20:06–20:33.
[17] Exhibit A, 20:06–20:33.

90.     Smith, Wolinsky, Ramirez, and Basov were close enough to hear Tuzinski's directions regarding fabricating exigency.

91.     Smith, Wolinsky, Ramirez, and Basov were close enough to hear Tuzinski's directions to know that Forty Fort's chief law enforcement officer was directing and encouraging officers to fabricate exigency.

92.     Ramirez used his flashlight and moved items on Yaksima's back porch.

93.     Ramirez rummaged through the items on the back porch, moved objects to look under them, and otherwise searched as he moved objects.[18]

94.     Wolinsky joined Ramirez in the search of the back porch of 22 Sullivan St. at this time.

95.     Ramirez discovered a package addressed to 105 Oak Street on the back porch.

96.     Ramirez had to move objects on the back porch in order to view this package and its address label.

97.     Ramirez also entered the back yard, rather than the walkway and/or stairway, to conduct this search.

98.     Ramirez had to move objects and manipulate the box in order to see the address label.

---

[18] Exhibit A, 21:49–22:30.

99.     Smith and Basov observed Ramirez and Wolinsky searching the back porch.

100.    Ramirez informed Smith, Wolinsky, and Basov that he found the package addressed to 105 Oak St.

101.    The search performed by Ramirez and Wolinsky to discover this package was unconstitutional and violated Yaksima's rights.

102.    Smith then ordered Basov to call Coslett and ask if he could enter 22 Sullivan St.

103.    Smith told Basov to inform Coslett that they found Albarella received mail at Yaksima's house and that they traced Albarella to 22 Sullivan St. with a phone ping.

104.    The only information the Luzerne County District Attorney's Office provided Yaksima in discovery for her criminal case regarding the phone ping was a form signed by Basov requesting phone ping information on an emergency basis from Verizon.

105.    The form provided in discovery required that it be sent via facsimile to Verizon who then "may" provide the requested information.

106.    The form does not have facsimile stamps on it that would demonstrate it was actually sent via facsimile to Verizon.

107.     The Luzerne County District Attorney's Office, while consulting with the Forty Fort police department, and presumably Smith, could not produce any other proof that this phone ping ever took place.

108.     No results of any alleged phone ping were ever provided to Yaksima in discovery despite requests for the same.

109.     Therefore, it is averred that this phone ping was fabricated as part of the conspiracy to illegally enter 22 Sullivan St.

110.     Smith alleged that the ping location from Albarella's cell service provider showed Albarella's cell phone was within 700 meters of 22 Sulivan St.

111.     Even if this phone ping existed, it was illegally obtained since Basov misrepresented that there was an emergency involving danger of death or serious injury to a person necessitating disclosure of any cell phone information.

112.     Even if the phone ping existed and was legally performed, two of CC Motor Sports buildings, where Albarella worked, were within the radius of the ping report.

113.     CC Motor Sports is located extremely close to 22 Sullivan St.

114.     Yaksima's Home and CC Motor Sports were within the radius of the ping report.

115.     Therefore, the ping report, or any cell service location data, provided no probable cause to believe Albarella was at 22 Sullivan St. rather than another location.

116.     Even if the phone ping existed and was legally performed, Albarella's approved residence of 105 Oak Street was also within the general area of any location information.

117.      Therefore, the ping report, or any cell service location data, provided no probable cause to believe Albarella was at 22 Sullivan St. rather than another location.

118.     Even if the phone ping existed, Basov stated on his body camera that the phone ping only showed Albarella's phone was somewhere in Forty Fort or Swoyersville.

119.     Therefore, he could have been at CC Motorsports, 105 Oak St., or any other location in Forty Fort or Swoyersville.

120.     Wolinsky confirmed that police already searched the front of Yaksima's house, including her mailbox that was located near her front door, and found no mail or other items linking Albarella to 22 Sullivan St.

121.     Smith, Wolinsky, and Ramirez mocked the Assistant District Attorney ("ADA") for not approving a search warrant.

122.     Tuzinski could hear this interaction between Smith, Wolinsky, and Ramirez.

123.     Basov likely heard this interaction between Smith, Wolinsky, and Ramirez since he was in close proximity to this interaction while speaking with Coslett on the phone.

124.     During this interaction, Smith, Wolinsky, and Ramirez acknowledged that the ADA would conclude that the package did not establish probable cause to believe Albarella was at 22 Sullivan St. in order to obtain a search warrant since the package was addressed to 105 Oak Street.[19]

125.     Defendants also did not know how long the package was on Yaksima's porch or who placed the package on Yaksima's porch.

126.     Tuzinski then stated to Smith, Ramirez, Wolinsky, and Basov that he saw things that could cause the property to be condemned.[20]

127.     At this point, Tuzinski, Smith, Ramirez, Wolinsky, and Basov began to conspire to have code enforcement condemn Yaksima's Home by falsely claiming there were dangerous conditions so that they could illegally enter the home.[21]

---

[19] Exhibit A, 23:50–24:08.
[20] Exhibit A, 24:00–24:10.
[21] Exhibit A, 24:17–25:10.

128.    Smith asked Tuzinski if the conditions of the house appeared dangerous enough that they had to immediately check the house.[22]

129.    Tuzinski responded that he was going to tell the landlord that was the case.

130.    Tuzinski's statement is an acknowledgement that any dangerous conditions were fabricated.

131.    Tuzinski then stated "I am going to start looking for reasons".

132.    Smith responded that Tuzinski was going to look for reasons to say that the house was dangerous.[23]

133.    At this time, Smith can be heard tapping on his body camera.

134.    Tuzinski responded "I know I was on" which was an acknowledgement that Smith was warning Tuzinski he was on camera.[24]

135.    Smith warning Tuzinski he was on camera demonstrates that Defendants knew they were engaging in illegal activity.

136.    Smith asked Tuzinski if he could condemn 22 Sullivan St. immediately in an emergency status.

137.    Tuzinski responded that he could and anytime a property is condemned it is an emergency.

---

[22] Exhibit A, 24:20–24:35.
[23] Exhibit A, 24:17–25:10.
[24] Exhibit A, 24:35–24:48.

138.    Smith then told Ramirez and Wolinsky that Tuzinski could enter the house for an emergency code inspection.

139.    Ramirez, Wolinsky, and Basov were close enough to hear this conversation between Smith and Tuzinsky.

140.    Tuzinski then instructed Smith, Ramirez, and Wolinsky to begin looking to see what needs to be immediately inspected by code enforcement.[25]

141.    This was Tuzinski instructing Smith, Ramirez, and Wolinsky to fabricate exigency and dangerous conditions at 22 Sullivan St.

142.    Basov informed Smith, Wolinsky, Ramirez, and Tuzinski that Coslett was going to speak to his supervisor about searching 22 Sullivan St.

143.    Smith informed Basov that Tuzinski was attempting to condemn the house and have an immediate inspection.[26]

144.    Tuzinski then stated to Basov, Smith, Ramirez, and Wolinsky that a rain gutter looked unsafe.[27]

145.    In response, Basov stated that he doesn't believe the house looks safe.[28]

146.    Smith agreed with this statement from Basov.

---

[25] Exhibit A, 25:30–25:40.
[26] Exhibit A, 25:50–26:10.
[27] Exhibit A, 25:45–25:55.
[28] Exhibit A, 25:50–26:10.

147.    Basov's statement constituted Basov acknowledging and supporting the conspiracy to illegally condemn and enter Yaksima's Home.

148.    Tuzinski then instructed Basov, Smith, Ramirez, and Wolinsky that they will have to clear the house if he has it condemned.

149.    Basov, Smith, Ramirez, and Wolinsky agreed to Tuzinski's instruction.

150.    This agreement to Tuzinski's order was Basov, Smith, Ramirez, and Wolinsky agreeing to illegally enter Yaksima's Home based upon fabricated conditions.

151.    Basov commented that 22 Sullivan St. reminded him of his apartment that had mold and the mold was a dangerous condition.

152.    This statement was Basov furthering the conspiracy to illegally enter Yaksima's Home.

153.    Smith, Basov, Ramirez, and Wolinsky joked while making various suggestions to fabricate exigency.

154.    These various suggestions to fabricate exigency constituted Smith, Basov, Ramirez, and Wolinsky furthering the conspiracy to illegally enter Yaksima's Home.

155.    Basov stated that the occupants of 22 Sullivan St. better get a box truck because they are moving.

23

156.    This statement is an acknowledgement that the ultimate goal of the conspiracy entered into at this point between Tuzinski, Smith, Ramirez, Wolinsky, and Basov was to remove Yaksima from 22 Sullivan St. and Forty Fort.

157.    Exhibit A demonstrates that Tuzinski, Smith, Ramirez, Wolinsky, and Basov engaged in a conspiracy to illegally condemn Yaksima's Home as a pretext to violate her constitutional rights.

158.    Basov, Smith, Wolinsky, Ramirez, and Tuzinski joked that all deals with Albarella were out of the question unless Albarella gave Basov a hand job, which was a clear reference to a lewd sexual act.[29]

159.    If Basov, Smith, Wolinsky, Ramirez, and Tuzinski truly believed that Albarella was a danger to himself or others, they would have acted with urgency rather than discussing Basov obtaining a lewd sexual act from Albarella in exchange for reducing Albarella's alleged criminal liability.

160.    Exhibit A demonstrates that Basov, Smith, Wolinsky, Ramirez, and Tuzinski were not concerned about Albarella making any threats of suicide or homicide or engaging in any conduct related to suicide or homicide.

---

[29] Exhibit A, 26:48–27:40.

161.     Exhibit A demonstrates that Basov, Smith, Wolinsky, Ramirez, and Tuzinski did not believe Albarella was making serious and/or immediate threats of self-harm or harm to others.

162.     Basov, Smith, Wolinsky, Ramirez and Tuzinski's conduct demonstrated that the accusations that Albarella was threatening suicide or homicide were false and manufactured to illegally search Yaksima's Home.

163.     Tuzinski obtained Yaksima's phone number and attempted to call her.

164.     No one answered the number Tuzinski dialed.

165.     Tuzinski then commented to Smith that many people no longer answer their phones because of spam calls.[30]

166.     This statement was an acknowledgement that Tuzinski, Smith, Basov, Ramirez, and Wolinsky were not concerned that Albarella and Yaksima were not answering their phones because Albarella was allegedly suicidal or homicidal.

167.     This statement was an acknowledgement that Tuzinski, Smith, Basov, Ramirez, and Wolinsky did not believe Yaksima was not answering her phone because of an emergency.

---

[30] Exhibit A, 33:37–33:50.

168.    Smith told Tuzinski that the worst case scenario was Defendants would "call it a day" and would eventually find Albarella because he was in the system.[31]

169.    This statement was an acknowledgement that Smith, Basov, Tuzinski, Ramirez, and Wolinsky were not concerned that Albarella was suicidal or homicidal.

170.    Smith commented to Wolinsky and Ramirez that it is "bullshit" that they don't have enough evidence for a search warrant.

171.    This statement was Smith acknowledging to Wolinsky and Ramirez that the District Attorney refused to approve a search of 22 Sullivan St. and that Defendants still did not have enough evidence to gain approval for a search of 22 Sullivan St.[32]

172.    Ramirez, Wolinsky, and Smith mocked the district attorney's office for not approving of their actions in the past.[33]

173.    This interaction described in paragraphs 170–172 demonstrates that Ramirez, Wolinsky, and Smith did not take the Luzerne County District Attorney Office's advice and/or opinions seriously and that they were aware

---

[31] Exhibit A, 33:50–34:00.
[32] Exhibit A, 35:25–35:45.
[33] Exhibit A, 35:30–36:15.

the Luzerne County District Attorney Office would not approve of their conduct.

174.     This interaction described in paragraphs 170–172 demonstrated that Ramirez, Wolinsky, and Smith had knowledge that facts would need to be misrepresented to the Luzerne County District Attorney for them to gain approval to enter 22 Sullivan St.

175.     Basov then stated to Ramirez, Wolinsky, Smith, and Tuzinski that he didn't know if they could justify a search based upon Albarella being suicidal.[34]

176.     Ramirez then told Basov to call the ADA again.

177.     Smith responded saying good idea.

178.     Basov then said "god damnit."

179.     Basov then intentionally spoke very softly to Wolinsky, Ramirez, Smith, and Tuzinski in an attempt to hide the words he was speaking from his body camera.

180.     Basov's actions in attempting to hide conduct from the body camera was in line with Smith's previously warning Tuzinski that he was on camera.

---

[34] Exhibit A, 36:10–36:30.

181.    Basov and Smith's conduct in attempting to hide certain conduct from the body cameras demonstrates they knew they were engaging in illegal conduct.

182.    Owens appeared at 22 Sullivan St.[35]

183.    Smith told Owens that the "story" was that Albarella has a felony warrant, 22 Sullivan St. is his girlfriend's house, Albarella had mail at 22 Sullivan St., and Albarella threatened suicide.[36]

184.    Tuzinski then falsely claimed again that he can hear someone crying for help and he was going to call the landlord to have her let them in because someone was crying for help.

185.    Ramirez, Wolinsky, Basov, Smith, and Owens heard no one call for help and knew this was false.

186.    Nevertheless, Defendants continued falsely claiming there was exigency.

187.    These actions were an acknowledgement that Ramirez, Wolinsky, Basov, Smith, and Owens knew any claims of exigency were false.

188.    Owens stated that if they have a felony warrant why don't Defendants just kick in Yaksima's door.

---

[35] Exhibit A, 37:41.
[36] Exhibit A, 37:52–38:55.

189.     Smith responded that they cannot kick in the door because they don't know that Albarella was inside 22 Sullivan St.

190.     This was an acknowledgment that all Defendants knew they did not have probable cause to believe Albarella was inside 22 Sullivan St. in order to justify obtaining a warrant or using any exception to the warrant requirement.

191.     Smith also stated that no one saw Albarella at 22 Sullivan St.

192.     Smith's comments that they did not know that Albarella was at Yaksima's Home and no one saw Albarella at Yaksima's Home were made so that Basov, Wolinsky, Ramirez, Owens, and Tuzinski would have heard these comment.

193.     Smith alleged that Yaksima's car was parked outside the home.

194.     Yaksima's vehicle being parked outside her home did not mean she was home at that time.

195.     Yaksima's vehicle being parked outside her home did not mean that Albarella was inside 22 Sullivan St. at that time.

196.     Smith told Owens, in an area where the other Defendants would have heard, that the ADA stated they did not have enough evidence to establish probable cause for a search warrant even though they, falsely, told the ADA that they had "tons of people" saying that Albarella had been living

at 22 Sullivan St. for months, had pinged his phone and it showed him within 700 meters of 22 Sullivan St., that they found Albarella's mail on the back porch, 22 Sullivan St. was Albarella's girlfriend's house, Yaksima's vehicle was at 22 Sullivan St., and that they believed Albarella was at 22 Sullivan St.[37]

197.    Smith informed Owens, in an area where the other Defendants would have heard, that Defendants' only options were to use the exigency doctrine or have state parole search the house.

198.    Smith informed Owens, in an area where the other Defendants would have heard, that Defendants had not seen Albarella at 22 Sullivan St. and that 22 Sullivan St. was not Albarella's house.[38]

199.    Smith informed Owens, in an area where the other Defendants would have heard, that his concern was since the ADA informed them that they do not have enough evidence to support a search warrant, they don't have enough evidence to enter the house based upon the arrest warrant.[39]

200.    Smith informed Owens, in an area where the other Defendants would have heard, that Tuzinski was attempting to get the house condemned on an emergency basis so that police could enter and search.[40]

---

[37] Exhibit A, 39:00–39:23.
[38] Exhibit A, 39:23–40:00.
[39] Exhibit A, 40:10–40:18.
[40] Exhibit A, 40:19–40:30.

201.     Smith presented the condemnation of the house as the third option Defendants were attempting in order to search the house.

202.     The first two options Smith presented to Owens were the exigency exception to the warrant requirement and a search by state parole.

203.     Smith informed Owens, in an area where the other Defendants would have heard, that Basov spent one hour on the phone with Albarella "a little while ago".[41]

204.     As stated *infra*, Smith testified under oath that Albarella only allegedly made threats of suicide and/or homicide via text message.

205.     Therefore, Basov had a one-hour conversation with Albarella "a little while ago" wherein no threats of suicide or homicide were made.

206.     Despite this, Defendants still falsely claimed that Albarella was suicidal and/or homicidal.

207.     Tuzinski instructed Smith to run the registration plate of a Kia parked near 22 Sullivan St.

208.     The plate was registered to Yaksima.

209.     This demonstrates that Defendants did not know that the car parked near 22 Sullivan St. was Yaksima's and they misrepresented this fact to the ADA prior to this point.

---

[41] Exhibit A, 40:30–40:35.

210.     Smith told Basov that if state parole decided not to search 22 Sullivan St., then police should use exigency to enter 22 Sullivan St.[42]

211.     This statement demonstrates that all Defendants knew there was no exigency.

212.     If exigency was truly present, all Defendants would have acted with urgency rather than spending substantial time attempting to enter the house in other ways.

213.     Smith approached Wolinsky, Ramirez, and Owens, in close proximity to Tuzinski so he would have heard what Smith said, and stated that they were waiting to see what state parole says and, if state parole refused to search the residence, Defendants would then boot the door and enter the house.[43]

214.     This demonstrates that all Defendants knew there was no exigency and if they could not get state parole to illegally enter Yaksima's Home, Defendants all planned and agreed to illegally enter Yaksima's Home.

215.     If exigency was truly present, all Defendants would have acted with urgency to respond to the emergency.

---

[42] Exhibit A, 42:30–42:50.
[43] Exhibit A, 42:50–43:20.

216.    Instead, all Defendants kept attempting to fabricate reasons to enter 22 Sullivan St. until the only option that remained was to falsely claim exigency existed.

217.    All Defendants were in close enough proximity to Basov as he spoke with the ADA on the phone that they would have been able to hear Basov speaking with the ADA.

218.    All Defendants knew that Basov was making misrepresentations to the ADA based upon all of the interactions described *supra* and their personal knowledge of the situation at the time.

219.    Basov told the ADA that they pinged Albarella's number to 22 Sullivan St.

220.    That representation was not true.

221.    Even if the phone ping actually occurred and was legally performed, this representation was not true.

222.    Basov told the ADA that the neighbor told him they saw Albarella go in and out of 22 Sullivan St., implying that they observed Albarella on February 7, 2021 at 22 Sullivan St.

223.    That representation was not true.

224.    Instead, the neighbor specifically informed Basov that they had not seen Albarella in days.

225.     Basov claimed "all their vehicles are here".

226.     That representation was false.

227.     At most, only Yaksima's vehicle was present at 22 Sullivan St.

228.     Basov claimed they had exigent circumstances to enter Yaksima's Home.

229.     That representation was false.

230.     Basov claimed that Shaun Flynn ("Flynn") stated that Albarella said he was going to shoot himself or get killed by police.

231.     That representation was false.

232.     The text messages between Flynn and Albarella demonstrate this claim was false.

233.     Basov claimed that Flynn obtained the phone ping.

234.     That representation was false.

235.     The only document regarding the phone ping that was provided to Yaksima in discovery, as described *supra*, showed that Basov might have signed a form for a phone ping. No information demonstrating that the phone ping was obtained by Flynn was provided. Therefore, Flynn never obtained the phone ping for Basov.

236.     Basov claimed that the 700 meter radius of the alleged cell phone ping placed Albarella at 22 Sullivan St.

237.    If the phone ping even existed, this was a fabrication by omission since the radius would have also encompassed CC Motor Sports and 105 Oak St.

238.    Basov claimed that the neighbor told him that Albarella drove Yaksima's vehicle.

239.    That representation was false.

240.    As can be seen on Basov's' body camera, the neighbor only told Basov that he saw Albarella plowing snow at 22 Sullivan St. multiple days prior.

241.    No mention of Albarella driving Yaksima's vehicle was ever made by the neighbor.

242.    Basov again claimed that multiple vehicles were present that would lead them to believe Albarella was inside 22 Sullivan St.

243.    That representation was false.

244.    Basov claimed that he spoke with Albarella less than one hour ago.

245.    In this statement, Basov omitted the important information that he had a conversation with Albarella less than one hour ago that had no indication that Albarella was a threat of suicide or homicide.

246.    Basov told the ADA he observed movement inside of the house.

247.     That representation was false.

248.     Basov claimed that he received the phone ping because Albarella was suicidal.

249.     Basov omitted the fact that, if the ping even existed, he misrepresented that police had exigency to obtain the phone ping.

250.     Basov claimed that Flynn told Albarella that Albarella was in a lot of trouble based on the fleeing charges filed.

251.     The text messages between Flynn and Albarella show that claim was false.

252.     Basov claimed that Albarella made the threats to commit suicide and/or homicide after he discovered that a warrant was issued for the fleeing charge.

253.     The text messages between Flynn and Albarella show that claim was false.

254.     Basov told the ADA that the alleged phone ping showed that Albarella hadn't moved from the radius in the last 3 hours.

255.     This claim was false.

256.     Basov acknowledged on his body camera that he could not check his email to see what the alleged phone ping showed for, at a minimum, the time that he was outside 22 Sullivan St. on February 7, 2021.

257.     Based on conversations between all Defendants on the body cameras, all Defendants would have known this was false.

258.     Wolinsky made jokes about how poor Basov's phone was when discussing that he did not have access to any ping information while at 22 Sullivan St.

259.     Basov claimed that Defendants were "watching movement" and "hearing talking" coming from 22 Sullivan St.

260.     That claim was false.

261.     Smith later testified under oath that Defendants heard "no noise" coming from 22 Sullivan St.

262.     Basov claimed that all of a sudden, within the last 30 minutes, that both Albarella and Yaksima stopped answering their phones.

263.     This claim was mostly false.

264.     While Basov and Yaksima did not answer their phones within the last 30 minutes, that was not out of the ordinary as Basov misled the ADA to believe.

265.     Specifically, Basov, or any other Defendant, never called Yaksima before that night.

266.    Tuzinski also specifically acknowledged that Yaksima may not answer from an unknown number because she may believe it was a spam call.

267.    Albarella's communications with Basov and Flynn also did not terminate in any way that could be considered that he was a threat of suicide or homicide.

268.    Therefore, Basov's representations to the ADA that Defendants were concerned because Yaksima and Albarella stopped answering their phones in the last 30 minutes was false.

269.    Basov claimed that Albarella's wife said he had not been at 105 Oak St. in months.

270.    This claim was false.

271.    Basov told the ADA that Albarella "either killed himself or killed his girlfriend and they are both dead".

272.    This claim was false.

273.    Basov told the ADA that "we are just trying to see if he is ok."

274.    That claim was false.

275.    Basov claimed that Albarella just went silent in the last 10 to 15 minutes.[44]

---

[44] Exhibit A, 51:35–51:48.

276.    That claim was false.

277.    Only after all of the above misrepresentations were made by Basov did the ADA approve an entry into 22 Sullivan St. based upon exigent circumstances.

278.    If the ADA knew that Basov was misrepresenting the facts of the case to him, he would not have approved the entry into 22 Sullivan St.

279.    If Basov had told the ADA the true facts of the case, he would not have approved the entry into 22 Sullivan St. as the ADA would have known there was no probable cause to believe Albarella was at 22 Sullivan St. and there was no exigency in the form of a danger of suicide or homicide.

280.    If Basov had told the ADA the true facts of the case, the ADA would have realized that no facts changed since he last denied Basov's request to obtain a search warrant and/or enter 22 Sullivan St. Therefore, the ADA would have again denied Basov's request to enter 22 Sullivan St.

281.    While Basov was on the phone with the ADA, Smith approached the other Defendants to say that Basov was telling the ADA their "proof" that Albarella was at 22 Sullivan St. and that he stopped communicating in a way that made him a threat to commit suicide or homicide.

282.    This statement by Smith to the other Defendants was false.

283.     Ramirez, Wolinsky, Owens, and Tuzinski would have known this statement was false and that Basov was misrepresenting facts to the ADA.

284.     Smith also stated that if Albarella was actually a threat of suicide he would be dead already because they were standing outside for so long.[45]

285.     Smith told Ramirez, Wolinsky, Owens, and Tuzinski that their claim that Albarella was a danger of committing suicide or homicide and stopped communicating with Defendants would allow the ADA to approve the entry without a search warrant.

286.     This was an acknowledgement that Smith knew that this false representation would be enough to trick the ADA into approving entry into the house.

287.     Wolinsky, Ramirez, and Owens' reacted in agreement to this comment.

288.     This demonstrated that Wolinsky, Ramirez, and Owens knew the fabrication would gain them approval from the ADA to enter 22 Sullivan St.

289.     Smith illegally searched Yaksima's garage by prying open a door to look inside.[46]

---

[45] Exhibit A, 52:40–53:00.
[46] Exhibit A, 56:40–57:00.

290.    Owens, Wolinsky, Ramirez, and Tuzinski observed Smith illegally search Yaksima's garage, said nothing to Smith, and did not stop Smith from searching the garage.

291.    All Defendants knew that the alleged neighbor that saw Albarella at Yaksima's Home had not seen Albarella at 22 Sullivan St. since Wednesday, February 3, 2021, which was four days prior.

292.    Smith testified under oath that Albarella made any alleged threats of suicide and/or homicide to Tuzinski on February 7, 2021.

293.    Smith testified under oath that the threats of suicide and/or homicide were not made to police but instead to Tuzinski on February 7, 2021.

294.    While testifying, Smith never alleged that threats of suicide and/or homicide were made by Albarella to Flynn despite opportunities to do so if it were true.

295.    Smith testified under oath that "Mr. Albarella made threats prior to us going to that house via text, which I saw, and other communications, that he was not going back to prison that night."

296.    Smith testified under oath that Albarella never stated he was going to hurt anyone.

297.     Smith testified under oath that Albarella never stated he was going to shoot anyone.

298.     Smith testified under oath that Albarella never stated that he had weapons.

299.     Smith testified under oath that the wording of the alleged threat was "I am not going back to jail."

300.     Smith never testified to any other threats or alleged that any other threats were made during his testimony at the preliminary hearing in Yaksima's criminal case despite opportunities to do so.

301.     Smith testified under oath that Albarella never stated he was going to take hostages.

302.     Smith testified under oath that Albarella never stated he was going to take Yaksima and/or her children as hostages inside 22 Sullivan St.

303.     Smith testified under oath that police heard no noise coming from 22 Sullivan St. on February 7, 2021.

304.     Smith falsely testified under oath that police saw shades moving back and forth as if someone was looking out the second story window of 22 Sullivan St. on February 7, 2021.[47]

---

[47] The body cameras demonstrate that this claim was false.

305.     Smith testified under oath that police never heard anyone calling for help from 22 Sullivan St. on February 7, 2021.

306.     Smith testified under oath that the exigency used to enter 22 Sullivan St. was that "Mr. Albarella had made threats prior to us going to [22 Sullivan St.] via text, which I saw, and other communications, that he was not going back to prison that night. He stopped communicating with us. We lost communication. His cell phone turned off. We had the phone pinged, it came back to within a few meters of Ms. Yaksima's residence. Based on that, with a warrant and concern that with the threats he had made and that there was a female and two small children most likely in that house, we made entry into that house."

307.     Smith's testimony was very different than what Basov relayed to the ADA on February 7, 2021.

308.     Smith's testimony that any phone ping "came back to within a few meters of Ms. Yaksima's residence" was false.

309.     Smith testified under oath that Tuzinski was the head of the Forty Fort police department as the mayor of Forty Fort.

310.     Smith testified under oath that Tuzinski was very involved with police activity as the mayor of Forty Fort.

311.     Smith testified under oath that Albarella reached out to Tuzinski regarding his situation.

312.     Albarella was friends with Flynn who was employed as a trooper with the Pennsylvania State Police.

313.     Albarella and Flynn communicated about the incident and the resulting arrest warrant via text message.

314.     According to his text messages with Albarella, Flynn communicated with state parole agents and the Forty Fort police on Albarella's behalf.

315.     Attached as Exhibit B are the text messages between Albarella and Flynn.[48]

316.     Albarella did not threatened suicide or harm to anyone in these text messages.

317.     Instead, in Albarella's text messages to Flynn he: (i) explained that he would not turn himself in until after his mother's funeral; (ii) discussed, with Flynn, how Basov filed ridiculous criminal charges against him; (iii) joked about fixing a "quad" for Flynn's brother; (iv) offered to help police reduce

---

[48] Undersigned redacted various phone numbers from Exhibit B. An unredacted copy will be provided in discovery.

crime in Forty Fort; and, (v) ultimately told Flynn that he was "ok" and planned on moving his life forward.[49]

318.    Albarella also exchanged text messages with Tuzinski on February 6, 2021 and February 7, 2021.

319.    These messages are attached as Exhibit C.[50]

320.    In these messages, Albarella never threatened suicide or harm to anyone.[51]

321.    Instead, Albarella told Tuzinski that he planned to surrender with his attorney after he talked with his attorney.[52]

322.    As Ramirez and Smith prepared to enter Yaksima's home, Smith remarked that he didn't believe Albarella had a gun, so he was not going to put on body armor prior to making entry.[53]

323.    Owens kicked in the front door to Yaksima's Home while the other Defendants congregated behind him.[54]

324.    All Defendants entered Yaksima's Home after Owens kicked in the front door.

---

[49] Exhibit B.
[50] Undersigned redacted various phone numbers from Exhibit C. An unredacted copy will be provided in discovery.
[51] Exhibit C.
[52] Exhibit C.
[53] Exhibit A, 1:01:20–1:01:44.
[54] Exhibit A, 1:03:00–1:03:20.

325.     Owens yelled "search warrant" when he kicked open the door.[55]

326.     Police found Albarella on the second floor of Yaksima's Home in bed with Yaksima.

327.     Owens used unnecessary and excessive force against Albarella while stating "welcome to my world buddy" while taking Albarella into custody.[56]

328.     Albarella told police he was going to turn himself in that day, which was also what he texted Tuzinski earlier.[57]

329.     Defendants held Yaksima at gunpoint even though she was clearly unarmed, engaged in no threatening conduct, and was laying in the bed with flu-like symptoms.[58]

330.     Basov told Albarella, in a location where the other Defendants would have heard him, that he should have just turned himself in at the police station like Basov told him to.

331.     This comment showed that all Defendants had no real concern for Albarella's safety and that they only manufactured exigency so they could search 22 Sullivan St. for Albarella.

---

[55] Exhibit A, 1:03:00–:1:03:20.
[56] Exhibit A, 1:03:20–1:04:45.
[57] Exhibit A, 1:04:40–1:04:55.
[58] Exhibit A, 1:03:20–1:06:35.

332.    Smith ordered Defendants to handcuff and arrest Yaksima.[59]

333.    Yaksima was then forcibly taken by Defendants out of her house, with inadequate clothing in the winter weather.

334.    Basov taunted Albarella about breaking down the door to 22 Sullivan St. while he was escorting him out of the house.

335.    Basov specifically said "you probably didn't think we were going to do that" to Albarella when referring to the broken door.

336.    These comments show that Basov had no concern for Albarella's safety and instead abused his authority in order to unconstitutionally search 22 Sullivan St.

337.    Basov also told Albarella that he was "getting the full ride" now.

338.    This was another demonstration that Basov was abusing his authority.

339.    After the unconstitutional arrests were made, Tuzinski and Smith permitted the landlord, his companion, and the owner of CC Motor Sports to enter Yaksima's Home and congregate inside.

340.    After being processed, Yaksima was taken to the Luzerne County Correctional Facility.

---

[59] Exhibit A, 1:07:00–1:08:00.

341.    At 8:31 a.m., on February 8, 2021, Yaksima was arraigned, unsecured bail was set, and she was later released from prison.

342.    After Defendants arrested Yaksima, they called Children and Youth who removed her children from her home.

343.    Forty Fort police posted on their Facebook account that they arrested Yaksima and Alberella.

344.    Yaksima was later evicted by her landlord because of Defendants' illegal activity in this case.

345.    Yaksima has suffered innumerable harms from the unconstitutional conduct of Defendants including, but not limited to, being arrested, evicted, incarcerated, having her children taken by the government, loss of freedom, reputational harm, fear, anxiety, stress, emotional distress, damage to her former residence, and attorney fees.

346.    Pennsylvania's Constitution provides that the right to reputation is a fundamental right and cannot be infringed upon. *In re J.B.*, 107 A.3d 1, 16 (Pa. 2014) ("This Court has recognized that the right to reputation . . . is a fundamental right under the Pennsylvania Constitution.")(citing *R. v. Commonwealth, Dep't of Pub. Welfare,* 636 A.2d 142, 149 (Pa. 1994); *Hatchard v. Westinghouse Broadcasting Co.,* 532 A.2d 346, 351 (Pa.

1987); *Moyer v. Phillips,* 341 A.2d 441, 443 (1975); *Meas v. Johnson,* 39 A. 562, 563 (Pa. 1898)).

347.     Plaintiff's reputation has been damaged because of Defendants' unconstitutional actions.

348.     After prolonged litigation concerning a motion to suppress evidence for the violations of Yaksima's constitutional rights, the Luzerne County District Attorney's Office withdrew the charge filed against Yaksima.

349.     In its motion to withdraw the charge, the Commonwealth specifically stated that "[a]fter speaking to [the] Officer and other relevant witnesses, and following a review of case law, a transcript of the Preliminary Hearing, and other pertinent documents related to the case, the Commonwealth does not believe that it can establish an imminent danger legally sufficient to provide exigent circumstances to justify the search."

350.     This motion demonstrates that if the true facts of the case had been relayed to the ADA on February 7, 2021, the ADA would not have approved entry into 22 Sullivan St. based upon exigent circumstances.

351.     The actions of Defendants were committed deliberately, intentionally, willfully, wantonly, and constitute conduct so egregious as to shock the conscience.

352.    The actions of Defendants were in callous disregard of Plaintiff's constitutional rights.

353.    These facts are demonstrated by, among other things, Defendants: (i) illegally searching Yaksima's front porch and mailbox; (ii) illegally searching her back porch, the items on her back porch, and garbage; (iii) illegally searching her garage; (iv) unashamedly manufacturing reasons to enter Yaksima's home in violation of her constitutional rights; (v) Tuzinski's admission that he previously manufactured exigency to unconstitutionally search someone's home; (vi) making jokes about the situation; (vii) suggesting that Albarella could resolve the arrest warrant by performing sex acts on a police officer; (viii) the overall attitudes and actions of the Defendants during the situation; (ix) attempting to hide certain actions from their body cameras and warning others that they were being recorded in an attempt to conceal their illegal behavior; (x) using excessive force against Albarella after Defendants illegally and forcibly entered Yaksima's Home; (xi) allowing various non-law enforcement individuals to enter Yaksima's Home after her arrest; (xii) falsifying police reports and the criminal complaint; and (xiii) Smith perjuring himself at the preliminary hearing regarding viewing threatening text messages.

354.    Defendants' disregard for Yaksima's constitutional rights was evident when they allowed Albarella to resolve the charge justifying his felony warrant with guilty pleas to summary Vehicle Code violations.

355.    This also showed that Defendants set aside Yaksima's constitutional rights to merely flaunt their authority, display police power, show political power, and to harass anyone who defied them.

356.    Defendant's disregard for Yaksima's constitutional rights continued months later when Smith perjured himself during the preliminary hearing to cover up the illegal search, and the willful, knowing, and blatant disregard for Yaksima's constitutional rights by all Defendants.

357.    Defendant's disregard for Yaksima's constitutional rights persisted until the Luzerne County District Attorney's Office finally withdrew the charges against her.

### *Count I – 42 U.S.C. § 1983 Claim Unconstitutional Search and Seizure*

358.    The foregoing paragraphs are incorporated herein by reference.

359.    The Defendants in this case are persons within the meaning of 42 U.S.C. § 1983.

360.    At all relevant times, the Defendants were acting under color of law within the meaning of 42 U.S.C. § 1983.

361.    While acting under color of law, Defendants caused Plaintiff to be subjected to a deprivation of rights, liberties, and immunities secured by the Constitution. Namely, Defendants caused Plaintiff to be deprived of the rights, liberties, and immunities that she is granted under the Fourth Amendment, Fourteenth Amendment, and Pennsylvania Constitution.

362.    A person has a reasonable expectation of privacy in his/her dwelling.

363.    Plaintiff had a reasonable expectation of privacy in 22 Sullivan St. at all times relevant to this complaint.

364.    Plaintiff had a subjective expectation of privacy in 22 Sullivan St. at all times relevant to this complaint.

365.    Plaintiff had an objective expectation of privacy in 22 Sullivan St. all times relevant to this complaint.

366.    Defendants unreasonably seized Plaintiff's property on February 7, 2021.

367.    Defendants unreasonably searched Plaintiff's property on February 7, 2021.

368.    Defendants had no warrant to enter Plaintiff's house on February 7, 2021.

369.     Defendants had no probable cause to enter Plaintiff's house on February 7, 2021.

370.     Defendants had no probable cause to believe Albarella was inside Yaksima's Home on February 7, 2021.

371.     Defendants had no exigent circumstances to enter Yaksima's Home on February 7, 2021.

372.     Defendants did not have consent to enter 22 Sullivan St. on February 7, 2021.

373.     Defendants severely damaged Plaintiff's front door and entrance by breaking her door down in violation of Plaintiff's rights.

374.     Defendants illegally searched and seized Plaintiff's property as described *supra*.

375.     It is the policy or custom of Forty Fort to unconstitutionally and illegally search and seize property.

376.     It is the policy or custom of Forty Fort to fabricate exigency to unconstitutionally and illegally search and seize property.

377.     It is the policy or custom of Forty Fort to unconstitutionally and illegally obtain evidence as a pretext to arrest individuals.

378.     It is the policy or custom of Forty Fort to use police power to harass people that challenge their political authority.

379.     This fact is demonstrated by the chief policymaker for Forty Fort, Tuzinski, encouraging and directing police officers to fabricate exigency and illegally enter Yaksima's Home.

380.     This fact is demonstrated by the chief policymaker for Forty Fort, Tuzinski, stating that he had previously manufactured exigency in order to illegally enter someone's home.

381.     This fact is demonstrated by Smith stating that manufacturing exigency is the "old school way" to illegally enter a person's home thereby demonstrating that Forty Fort has a long-standing policy to manufacture exigency to illegally enter and/or search a person's property.

382.     The mayor of Forty Fort, Tuzinski, encouraged and directed Defendants to fabricate exigency to illegally enter Yaksima's Home thereby proving that Forty Fort trains its employees to violate the rights of the residents of Forty Fort.

383.     Tuzinski, through his encouragement and directions for Defendants to fabricate exigency, caused Basov to make misrepresentations to the ADA to obtain permission to enter 22 Sullivan St.

384.     Tuzinski, through his encouragement and directions for Defendants to fabricate exigency, caused 22 Sullivan St. to be illegally entered on February 7, 2021.

385.     There is a history of municipal employees, such as the named Defendants, fabricating exigency as stated by Smith and Tuzinski on video as described *supra*.

386.     Tuzinski trained and/or supervised Defendants on the policies or customs described above.

387.     Smith trained and/or supervised Defendants on the policies or customs described above.

388.     Basov trained and/or supervised Defendants on the policies or customs described above.

389.     Because of the above-described policies and customs, Plaintiff suffered a deprivation of liberty under the Fourth Amendment, Fourteenth Amendment, and Pennsylvania Constitution through an unconstitutional false arrest and search of her home.

390.     Tuzinski ratified the actions of his subordinates, including all of the named Defendants, in this case by encouraging and directing them to fabricate exigency and illegally enter Yaksima's Home.

391.     Smith ratified the actions of his subordinates, including all of the named Defendants, with the exception of Tuzinski who would have been Smith's superior, in this case by encouraging and directing them to fabricate exigency and illegally enter Yaksima's Home.

392.     Basov ratified the actions of his subordinates, including all of the named Defendants, with the exception of Tuzinski who would have been Basov's superior, in this case by encouraging and directing them to fabricate exigency and illegally enter Yaksima's Home.

393.     At the time of the unconstitutional entry into Yaksima's Home, it was clearly established that either a warrant supported by probable cause or an exception to the warrant requirement was necessary to enter Yaksima's Home.

394.     This fact is shown by Defendants stating that they needed either a warrant or an exception, such as exigency, to the warrant requirement to enter Yaksima's Home throughout the night.

395.     Plaintiff suffered numerous damages as stated throughout this Amended Complaint as a result of Defendants lawless and unconstitutional actions.

**WHEREFORE**, Plaintiff demands judgment against Defendants for actual damages, compensatory damages, punitive damages, costs, and attorney's fees.[60]

---

[60] Plaintiff only asserts the punitive damages claims against the Defendants in their individual capacity. Plaintiff does not assert the punitive damages claim against Forty Fort since punitive damages cannot be obtained when a lawsuit under 42 U.S.C. § 1983 is brought against an individual in their official capacity.

## *Count II – 42 U.S.C. § 1983 Claim for False Arrest*

396.     The foregoing paragraphs are incorporated herein by reference.

397.     Plaintiff was arrested by Defendants after they illegally entered 22 Sullivan St.

398.     Any probable cause Defendants obtained to arrest Plaintiff was from their illegal and unconstitutional actions.

399.     No legally obtained evidence to support probable cause existed to arrest Plaintiff for committing any crime on or about February 7, 2021.

400.     Defendants knew this fact since they did not formally decide to arrest Yaksima until after they illegally obtained evidence during the unconstitutional search of Yaksima's Home.

401.     Defendants had no warrant to arrest Plaintiff on February 7, 2021.

402.     Defendants falsely arrested Plaintiff on February 7, 2021.

403.     Plaintiff suffered damages as described *supra* as a result of this unconstitutional arrest.

   **WHEREFORE**, Plaintiff demands judgment against Defendants for actual damages, compensatory damages, punitive damages, costs, and attorney's fees.[61]

---

[61]*See* Footnote 60.

<u>*Count III – 42 U.S.C. § 1983 Claim for Unconstitutional Conspiracy*</u>

404.     The foregoing paragraphs are incorporated herein by reference.

405.     The Defendants entered into a conspiratorial agreement prior to Plaintiff being subjected to the unconstitutional search and seizure described *supra*.

406.     The agreement between the Defendants was to forcibly enter Yaksima's Home without a warrant or probable cause after fabricating exigency.

407.     Defendants knew that they needed either a warrant supported by probable cause or probable cause and exigency to support their entry into Yaksima's Home but nonetheless agreed to forcibly enter Yaksima's Home in violation of said doctrines.

408.     The conspiracy began, at the latest, at 22 Sullivan Street in Forty Fort on February 7, 2021.

409.     The conspiracy was furthered when Basov, Owens, Ramirez, Smith, and Wolinsky made light of the situation while trying to fabricate exigency to justify a warrantless residential entry.

410.     The conspiracy was furthered when Tuzinski encouraged and directed Defendants to fabricate exigency.

411.    The conspiracy was furthered when Smith told Tuzinski that the "old school way" was to fabricate exigency.

412.    The conspiracy was furthered when Smith reminded Tuzinski that his body camera was recording thereby discretely telling Tuzinski to be careful about discussing the nefarious conduct they were plotting.

413.    The conspiracy was furthered when Smith and Tuzinski discussed shining unnecessary lights from a fire department on Yaksima's Home "to do a Noriega".

414.    The conspiracy was furthered when Ramirez and Wolinsky illegally searched the back porch to Yaksima's Home, the items on the porch, and moved items to discover the package on the porch.

415.    The conspiracy was furthered when Smith directed Basov to call state parole to report that Albarella had mail at 22 Sullivan St. with the goal of motivating state parole to make entry into Yaksima's Home, when Smith knew that the package was addressed to Albarella's 105 Oak Street residence and was insufficient to connect Alberella to Yaksima's Home.

416.    The conspiracy was furthered when Basov claimed that Yaksima's Home was fortified with cameras and boarded windows.

417.    The conspiracy was furthered when Owens falsely claimed to see movement inside Yaksima's Home.

418.    The conspiracy was furthered when Smith forced entry into the garage to Yaksima's Home search for Albarella.

419.    The conspiracy was furthered when Defendants decided to fabricate reports about Albarella making suicidal threats to justify a warrantless residential entry.

420.    The conspiracy was furthered when Defendants decided to mislead others regarding cell service data by suggesting that it showed Albarella was inside 22 Sullivan St.

421.    The conspiracy was furthered when Defendants decided to mislead others about witnesses stating Albarella was inside 22 Sullivan St.

422.    The conspiracy was furthered when Basov, Smith, and Tuzinski misreported when a neighbor last saw Albarella at 22 Sullivan St.

423.    The conspiracy was furthered when Basov misrepresented the facts of the case to the ADA to obtain permission to enter Yaksima's Home.

424.    The conspiracy was furthered when all Defendants knew Basov was misrepresenting the facts of the case to the ADA to obtain permission to enter Yaksima's Home and joined in with the illegal conduct rather than preventing it.

425.    The conspiracy was furthered when Ramirez and Smith decided not to use armor when making the illegal entry because Smith did not think

Albarella had a gun, thereby showing he was not a danger to himself or others.

426.    The conspiracy was furthered when Defendants, specifically, Owens, kicked down the door to Yaksima's Home.

427.    The conspiracy was furthered when Defendants entered Yaksima's Home.

428.    The conspiracy was furthered when Basov, Owens, Ramirez, Smith, and Wolinsky pointed guns at Yaksima while she was in bed.

429.    The conspiracy was furthered when Defendants arrested Yaksima.

430.    The conspiracy was furthered when Defendants called CYS to take Yaksima's children from the residence.

431.    The conspiracy was furthered when Smith and Tuzinski made false reports about the case to Yaksima's landlord and to Albarella's employer.

432.    The conspiracy was furthered when Defendants pursued unwarranted criminal charges against Plaintiff.

433.    The conspiracy was furthered when Smith perjured himself at the preliminary hearing to attempt to cover up the fact that Defendants fabricated exigency.

434.    The conspiracy was furthered when all Defendants witnessed the unconstitutional conduct of their co-defendants and did nothing to stop or prevent it.

435.    This conspiracy ended at the latest when the Commonwealth of Pennsylvania dismissed the charge against Yaksima on or about February 8, 2022.

436.    The purpose of the unconstitutional conspiracy was to forcibly enter Plaintiff's residence in violation of her constitutional rights, unjustifiably charge Plaintiff with a crime, and charge Alberella with a crime.

437.    These actions were designed to drive Yaksima and Alberella out of Forty Fort.

438.    The meeting of the minds for this conspiracy occurred on the body camera and on February 7, 2021 as described throughout this Amended Complaint.

439.    Defendants took action to achieve the purposes of this unconstitutional conspiracy as described *supra*.

**WHEREFORE**, Plaintiff demands judgment against Defendants for actual damages, compensatory damages, costs, attorney's fees, and punitive damages.[62]

---

[62] *See* Footnote 60.

## *Count IV – Conversion*

440.　　The foregoing paragraphs are incorporated herein by reference.

441.　　Defendants in this case deprived Plaintiff of the use of her door and residence at 22 Sullivan Street without her consent or lawful justification on February 7, 2021.

442.　　Defendants intentionally damaged Plaintiff's door, entryway, and home located at 22 Sullivan Street on February 7, 2021.

443.　　Defendants intentionally damaged Plaintiff's door, entryway, and home located at 22 Sullivan Street on February 7, 2021 despite knowing that had no lawful right to do so.

444.　　Plaintiff had rightful possession of 22 Sullivan Street on February 7, 2021.

445.　　Plaintiff also had an immediate right to possession of 22 Sullivan Street on February 7, 2021.

446.　　The conduct of Defendants was willful, wanton, and was so egregious as to shock the conscience as described throughout this Amended Complaint.

447.　　Plaintiff suffered damages as described above as a result of Defendants conversion.

**WHEREFORE**, Plaintiff demands judgment against Defendants for actual damages, compensatory damages, costs, and punitive damages.

### *Count V – Trespass to Chattel*

448.    The foregoing paragraphs are incorporated herein by reference.

449.    Defendants intentionally intermeddled with the door, entrance way, and residence of Plaintiff on February 7, 2021 at 22 Sullivan Street by damaging her door, entrance way, and home.

450.    Defendants intentionally intermeddled with the door, entrance way, and residence of Plaintiff on February 7, 2021 at 22 Sullivan Street despite having no lawful right to do so.

451.    Plaintiff had rightful possession of 22 Sullivan Street on February 7, 2021.

452.    Plaintiff also had an immediate right to possession of 22 Sullivan Street on February 7, 2021.

453.    The conduct of Defendants was willful, wanton, and was so egregious as to shock the conscience as described throughout this Amended Complaint.

454.    Plaintiff suffered damages as described above as a result of Defendants conversion.

**WHEREFORE**, Plaintiff demands judgment against Defendants for actual damages, compensatory damages, costs, and punitive damages.

*Count VI – Jury Trial Demand*

455.     The foregoing paragraphs are incorporated herein by reference.

456.     Plaintiff hereby demands a jury trial.

**WHEREFORE**, Plaintiff demands judgment against Defendants for

- a. Actual damages;

- b. Punitive damages;

- c. Compensatory damages;

- d. Attorney's fees;

- e. Costs;

- f. Interest; and

- g. Any further relief that the Court deems just and proper.

Respectfully Submitted,

*/s/ Leonard Gryskewicz, Jr.*
Leonard Gryskewicz, Jr.
Attorney for Plaintiff
PA321467
Lampman Law
2 Public Sq.
Wilkes-Barre, PA 18701
Phone: (570) 371-3737
Fax: (570) 371-3838

*/s/ David V. Lampman, II*
David V. Lampman, II
Attorney for Plaintiff
PA93332
Lampman Law
2 Public Sq.
Wilkes-Barre, PA 18701
Phone: (570) 371-3737
Fax: (570) 371-3838